UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| AARON VILCEK, DOUGLAS A. UCHENDI, JEFFREY HAMILTON, AND ROBERT GLYNN,<br><br>Plaintiffs,<br><br>v.<br><br>UBER USA, LLC and UBER TECHNOLOGIES, INC.,<br><br>Defendants. | Case No. 4:15-CV-1900 HEA |

## DEFENDANT UBER TECHNOLOGIES, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS

Uber showed in its opening Memorandum ("Memo.") that this third ongoing case pitting the taxi industry in St. Louis against Uber—a case which involves a single count, for tortious interference—fails as a matter of law and should be dismissed for several reasons. (Doc. No. 6).

First, Uber explained that the only "wrongdoing" that Plaintiffs allege is that Uber purportedly violates MTC rules (the "Taxi Code"), but the Taxi Code provides no private right of action. In their Response ("Resp."), Plaintiffs largely ignore this fatal, threshold issue, discussing it only in the context of the lack-of-justification element of tortious interference. But that misses the point—tortious interference is not a "catch-all" tort that can be used to engraft a private right of action onto statutes that lack one, which is exactly what Plaintiffs seek to do here. Their effort flies in the face not only of Missouri case law, but cases from across the country, including decisions in which courts rejected similar backdoor attempts by the taxi industry to assert alleged regulatory violations against Uber in the guise of a tortious interference claim.

Even putting that dispositive threshold issue aside, Uber showed that there is a fundamental mismatch between Plaintiffs' allegations and various elements of tortious

interference. For example:

- As Plaintiffs concede, a plaintiff must allege that the defendant used "wrongful means" *to induce a breach* of a business expectancy. But the "wrongful means" that Plaintiffs allege here is not a means of inducing a breach at all (i.e., a means of driving a wedge between a taxi driver and his or her customer), but rather an (allegedly wrongful) means of providing a competing service. That cannot make out a claim for tortious interference, as it does not relate to *any interference*.

- Even if a tortious interference plaintiff could point generally to how a defendant *operates*, as opposed to how it allegedly *interfered*, "wrongful means" is limited to conduct that itself gives rise to a private right of action (e.g., fraud, misappropriation of trade secrets, etc.). Here, as noted above, Plaintiffs have alleged no such wrongful conduct, as there is no private right of action to enforce MTC Rules.

- Plaintiffs have likewise failed to allege that the claimed MTC Code violations *caused* the alleged breach of a business expectancy. To the contrary, Plaintiffs specifically allege in their Complaint that Uber easily could comply with the MTC Code, meaning that the alleged Code violations are not the real target. Rather, Plaintiffs' real complaint here (as they admit, *see* Compl. ¶ 37) is that Uber's mere presence in St. Louis is harming them. But that is the nature of competition, which is something that Missouri courts *protect*.

- Uber showed that Plaintiffs have failed to allege a valid business expectancy, a necessary element for tortious interference. Indeed, both in their Complaint and in their Response, Plaintiffs make it clear that they are attempting to stake a collective legal claim on *all* possible for-hire transportation customers in St. Louis, even though no one driver in the collective group of plaintiffs could possibly show that he or she had *any* expectancy as to a given fare. Plaintiffs fail to identify any case law supporting this absurd notion, ignore cases rejecting "mere hope" as the basis for a valid expectancy, and cannot overcome this fatal problem by pointing to alleged "magic words" in their Complaint.

In the end, Plaintiffs have no legal right to prevent drivers who use uberX from seeking to earn a living in St. Louis. They clearly wish that they did not have to compete with uberX, but that wish is not a viable legal theory. At bottom, their suit is about alleged MTC violations, but those claims are being fully litigated (indeed, doubly litigated) elsewhere (to say nothing of the existing enforcement mechanisms available to the MTC itself). Their efforts to re-litigate that same issue yet again here fail as a matter of law. Indeed, if anything, their efforts are but one more example of the wrongful collective efforts by the taxi industry to bar Uber from the St. Louis market, efforts that Uber has shown elsewhere violate the antitrust laws.

# ARGUMENT

The parties agree (*see* Resp. at 2) that, to survive Uber's motion to dismiss, Plaintiffs must "state a claim to relief that is plausible on its face." *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 716 (8th Cir. 2011) (quotations omitted). The parties further agree that "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation and punctuation omitted). Under these standards, Uber established that Plaintiffs' Complaint fails as a matter of law and should be dismissed. Plaintiffs' Response fails to revive their lawsuit.

A. **Plaintiffs Cannot Create A Private Right Of Action To Enforce the MTC Taxi Code.**

As a threshold matter, Uber showed in its Memorandum that (1) there is no private right of action to enforce the MTC's Taxi Code, but (2) that is the only "wrongdoing" that Plaintiffs allege. Plaintiffs do not contest either of these points. Nor do they contest that, if their Complaint were to succeed, it would be the ***first time ever*** that any party other than the MTC has enforced MTC Rules. Likewise, Plaintiffs ignore cases like *Noss v. Abrams*, 787 S.W.2d 834, 837-38 (Mo. Ct. App. 1990), in which a Missouri court dismissed an effort to base a tort claim (there "fraudulent concealment") on nothing more than alleged violations of Missouri Real Estate Commission rules—for which there was no private right of action. In fact, Uber cited numerous cases that dismissed "tort" claims (often taxi drivers claiming tortious interference against Uber) that were based on alleged violations of administrative rules or municipal ordinances. (*See* Memo. at 8-9). Plaintiffs do not mention, let alone distinguish, these cases, nor do they offer conflicting authority on this point.

If Plaintiffs are allowed to proceed here, then the whole issue of whether a given rule creates a "private right of action" is moot. That analysis rests on the understanding that, when a legislative body creates a rule, it also selects the means of enforcement—e.g., a private right of

action vs. regulatory enforcement. But, under Plaintiffs' approach, that distinction is lost. For those rules that create a private right of action, a plaintiff will sue under the rule. For those that do not, a plaintiff will simply claim that a competitor's violation of the rule caused the plaintiff harm, and then sue for "tortious interference." That would throw the courthouse doors open wide indeed. Barbers, for example, could sue other barbers alleging that failure to store clippers in "clean, dust-tight cabinet[s] or drawer[s]" in violation of Mo. Code Regs. tit. 20, § 2085-11-010(2)(C)(1)(E) constitutes "tortious interference." Podiatrists could sue other podiatrists asserting a failure to maintain a "Contagion, Infection and Communicable Disease Log," in violation of Mo. Code Regs. tit. 20 § 2230-2.023(5)(D)(2). The list is endless. That is not the law, nor should it be. Plaintiffs' failure even to engage on this threshold issue dooms their tortious interference claim as a matter of law.

**B.** **Plaintiffs Fail to Allege That Uber Used Wrongful Means To Induce A Breach.**

Even putting aside that this suit is a thinly-disguised effort to engraft a private right of action on to the MTC Code, Plaintiffs also have failed to properly allege a tortious interference claim for other reasons. To start, Plaintiffs failed to allege a "wrongful means." As a general matter, Missouri law protects competition—including protecting one competitor's efforts to win customers from another competitor. Accordingly, a plaintiff can assert tortious interference against a competitor only when that competitor is alleged to have used "wrongful means" in its efforts to drive customers away from the plaintiff. *See, e.g.*, *Conoco Inc. v. Inman Oil Co.*, 774 F.2d 895, 907 (8th Cir. 1985) (applying Missouri law). As Uber showed, Plaintiffs have failed to allege such wrongful means here for two reasons.

First, "wrongful means" under Missouri law refers only to "means which are intrinsically wrongful—that is, conduct which is itself capable of ***forming the basis for liability*** of the actor." *Id.* (emphasis added). Statutes or regulations that do not create private rights of action do not fit

4

this definition, which is why so many cases reject attempts to convert such alleged violations into tortious interference or other private tort claims. (*See* Memo. at 7-9). Second, Plaintiffs point to the wrong conduct. They do not allege that Uber uses wrongful means in its efforts to drive customers away from Plaintiffs (i.e., to induce the breach), but rather that Uber allegedly uses wrongful means in the way it allegedly operates the competing service itself. Plaintiffs have no good response on either front.

On the first point, Plaintiffs offer *Carter v. St. John's Reg'l Med. Ctr.*, 88 S.W.3d 1 (Mo. Ct. App. 2002), and *Sales Resource, Inc. v. All. Foods, Inc.*, Nos. 4:08cv0732 and 4:09cv0666, 2010 WL 5184943, *12 (E.D. Mo. Dec. 15, 2010), as asserted support for a broad proposition that alleging *any* violation of *any* statute (or common law) suffices to show "wrongful means." (Resp. at 12-13). But those cases do not support that proposition. To the contrary, they only further establish the divide between those laws that do provide a private cause of action (and thus could support a tortious interference claim) and those that do not. Unlike here, both of those cases involved asserted violations of statutes that *did* create a private right of action. In *Carter*, for example, the statutory violation that the plaintiff cited as the basis for alleging "wrongful means" included a private right of action for withholding patients' medical records. *See, e.g.*, *Wear v. Walker*, 800 S.W.2d 99, 104 (Mo. Ct. App. 1990). To be sure, the right of action there belonged to the patient himself or herself, and thus the doctor plaintiff in *Carter* could not directly assert that claim—but there was no question that the hospital's allegedly wrongful conduct, unlike the alleged conduct here, did give rise to a private right of action. Likewise, the statute in *Sales Resources* was the Missouri Merchandising Practices Act (MMPA), a statute that "serves as a supplement to the definition of common law fraud," *id*. at *26, and expressly provides for "a private cause of action . . . to recover actual damages," *id* at *27 (quoting Mo.

5

Rev. Stat. § 407.025.1).  As the statutes in both of those cases included a private right of action, statutory violations could give rise to a "wrongful means" for tortious interference purposes.

But that is not the case here.  As noted above, the MTC Code does not create a private right of action.  And, "[i]t strains logic to think that everything one's competitor is doing that does not comply with state and federal laws and regulations . . . can provide a private cause of action for its competitors.  There is nothing in the history of the tortious interference laws that indicate[s] they were designed to reach that far . . . ."  *Ecosure Pest Control, Inc. v. Eclipse Mktg., Inc.*, No. 2:09-CV-1108, 2010 WL 3363071, at *3 (D. Utah Aug. 23, 2010).  Uber made this clear in its opening Memorandum, and Plaintiffs do nothing to effectively refute it.  Indeed, they have not cited a single case in which an alleged violation of a statute lacking a private right of action served as the foundation for a tortious interference claim.

Nor have Plaintiffs offered any good response on Uber's second point—that Plaintiffs' argument here focuses on the wrong conduct.  The question is not whether a defendant did ***anything*** wrongful, but rather whether the defendant wrongfully induced or caused the "breach." *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 976 (8th Cir. 2011).  In other words, is the defendant alleged to have wrongfully ***interfered*** with a business relationship or expectancy?  Thus, the tort focuses on the methods of interference themselves (i.e., the methods the defendant allegedly used to drive a wedge between the plaintiff and its customers), not the mere fact of competition or the methods by which a competitor provides the competing service.  (*See* Memo. at 11).  The closest that Plaintiffs come to responding to this point is chastising Uber for not citing language in *Community Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369 (Mo. 1990), that "improper means" includes not only "misrepresentation of fact, threats, violence, defamation, trespass, [and] restraint of trade" (all of which Plaintiffs do

6

not dispute refer to methods of interfering with a competitor's relationships with its customers), but also "any other wrongful act recognized by statute or the common law. " *Id*. at 373. (*See* Resp. at 10-11). This language does not change Uber's point in the slightest. "[O]ther wrongful act[s] recognized by statute or the common law" refers to other ***similar*** wrongful acts—i.e., other wrongful ways ***of interfering***. To be sure, there may well be many other ways, beyond the listed examples, to ***interfere*** with (i.e., drive a wedge between) a plaintiff and a valid business expectancy. But that does not mean that wrongful acts unrelated to interference would suffice— after all, it is tortious ***interference***, not tortious conduct writ large, that is the focus of the tort.

In short, Plaintiffs have failed to show the necessary "wrongful means," and thus cannot show that Uber's competition "lacks justification." Accordingly, their tortious interference claim leveled against a market competitor fails as a matter of law.

C. **Plaintiffs Fail To Allege That Uber's Intentional Interference Induced or Caused Their Damages.**

For related reasons, Plaintiffs' tortious interference claim fails as a matter of law for failing to adequately plead causation and intent. As Uber showed in its original memorandum, Missouri law requires plaintiffs to establish "a breach ***induced or caused*** by defendant's ***intentional interference***." *AvidAir Helicopter Supply*, 663 F.3d at 976 (emphasis added). Plaintiffs argue that the mere fact of competition (allegedly undertaken in violation of a Taxi Code rule), as opposed to some action that intentionally drives a wedge between Plaintiffs and their business expectancies, is enough meet that element, but their own cited authority refutes this point. As Plaintiffs recite (Resp. at 8), the threshold question in *American Business Interiors, Inc. v. Haworth, Inc.*, 798 F.2d 1135 (8th Cir. 1986), was whether the "defendant [took] steps ***to induce loss*** of the business expectancy." *Id*. at 1144 (emphasis added). Likewise, *Carter* asks whether the "interferer actively and affirmatively [took] ***steps to interfere***." *Carter*,

7

88 S.W.3d at 15 (emphasis added). This is a different inquiry from the question of whether something—anything—happened that ultimately led to a plaintiff losing a business expectancy. The salient question is whether a defendant "actively," "affirmatively" "interfered" and "induce[d] loss."

To be sure, the defendants' conduct in the cases Plaintiffs cited met that standard, but a closer examination of that conduct shows why the allegations here do not likewise give rise to a claim. In *American Business Interiors*, a defendant manufacturer refused a plaintiff dealer's request to provide pricing information for use in the dealer's bid for a new sale to a customer. The manufacturer did so, despite a legal duty to provide the information, intending to prevent the sale, and as a direct result, the dealer was unable to submit a bid. *Id*. at 1138, 1146. In *Carter*, the defendant hospital blocked a plaintiff physician's pathology consulting privileges at the hospital, directly causing a loss of patients. *Carter*, 88 S.W.3d at 6. In both cases, the defendants were undertaking conduct designed to impede the plaintiff's efforts to engage in additional transactions with its customers or potential customers.

This case is different. Plaintiffs' own Complaint, on its face, does not plausibly claim that, in allegedly violating Taxi Code rules, Uber *intended* to drive a wedge between Plaintiffs and their business expectancy, nor that the alleged violations *caused* any such interference. Quite to the contrary, they allege that they "will continue to lose revenue *so long as Uber continues its operations*," (Compl. ¶ 37 (emphasis added)), i.e., regardless of whether those operations allegedly violate Taxi Code rules. Indeed, they allege that "Uber is fully capable of complying with the Taxi Code in its operations." (Compl. ¶ 34). In other words, they assert that uberX would continue to be available in St. Louis even without any alleged Taxi Code violation. These statements in Plaintiffs' own Complaint remove any legitimate factual dispute, and

8

establish as a matter of law that Plaintiffs have failed to adequately allege intent or causation.

In response, Plaintiffs attempt to walk back from their Complaint, abandoning their allegation that Uber is "fully capable" of complying, and asserting instead, based on allegations outside of their Complaint, that the Taxi Code rules are "not trivial" and that compliance would result in "far fewer" drivers using uberX in competition with Plaintiffs. (Resp. at 7). Of course, "a plaintiff cannot add factual allegations to the complaint by raising them in a memorandum in opposition to a motion to dismiss." *Country Mut. Ins. Co. v. Cronin*, No. 4:11-CV-1851 CAS, 2013 WL 1282333, at *6 (E.D. Mo. Mar. 26, 2013). But in any event, the fact remains that Plaintiffs have alleged that drivers who use uberX—some or all—would still do so *even if* the alleged Taxi Code violations did not exist. That means that Plaintiffs' Complaint does not plausibly allege a causal connection between the alleged Taxi Code violations and Plaintiffs' loss of business. Rather, the Complaint shows that the real target is the mere competition itself. But competition is not tortious interference, and the Court should dismiss Plaintiffs' Complaint.

D. **Plaintiffs Fail to Allege a Valid Business Expectancy.**

Finally, Uber established that Plaintiffs' tortious interference claim fails because Plaintiffs have not adequately alleged a valid business expectancy. Plaintiffs assert a legal claim to *all* for-hire transportation customers in St. Louis, but that is not a valid and cognizable "business expectancy." (*See* Memo. at 13-15). Plaintiffs have alleged no existing relationship with any particular customers, nor any history or practice with regard to any specific rider or riders that would give rise to any reasonable expectation that any particular driver in the putative plaintiff class would be successful in earning future business from that rider. To the contrary, taxi fares tend to consist of anonymous street hails, and any one driver, far from having an "expectancy" as to a particular fare, knows that he or she is competing with hundreds of other drivers in the metropolitan market for that fare. Accordingly, as a matter of law, no driver can

9

have a valid "expectancy" as to any rider.  In their opposition, Plaintiffs offer two responses on the business expectancy issue, one procedural and one substantive.  They both fail.

On the procedural front, Plaintiffs seek to push this problem down the road by claiming that the validity of a business expectancy is a factual issue that is not amenable to resolution at the motion to dismiss phase.  To that end, they offer the uncontroversial observation from *Sales Resource,* 2010 WL 5184943, at *10, that "*[d]isputes* regarding whether or not the business expectancy is *reasonable*, and whether or not Plaintiffs are *credible* in their assertions as to their expectancies, are questions for the jury." (Resp. at 3 (emphasis added)).  That observation is, in equal parts, entirely true and wholly inapplicable here.  Courts have had no reservations in resolving tortious interference claims as a matter of law where a plaintiff has failed to identify a legitimate claim of a business expectancy.  For instance, in *Sales Resource* itself—the very case on which Plaintiffs rely for this point—the court granted summary judgment to the defendants on some of the plaintiffs' tortious interference claims, finding no business expectancy as a matter of law.  *Sales Resource*, 2010 WL 5184943, at *12.  And in *Genovese v. DCA Food Indus., Inc.*, 911 F. Supp. 378, 380 (E.D. Mo. 1996), this Court granted a motion to dismiss a tortious interference claim because the "business expectancy alleged in the complaint [was] too indefinite and remote . . . ." *See also Sloan v. Bankers Life & Cas. Co.*, 1 S.W.3d 555, 559 (Mo. Ct. App. 1999) (affirming grant of JNOV motion when, as a matter of law, Plaintiffs failed to establish valid business expectancy).  The same is true here—Plaintiffs have failed to identify a sufficiently specific business expectancy, and their Complaint thus fails as a matter of law.

Plaintiffs fare no better in seeking to salvage their business-expectancy allegations on the merits—i.e., in arguing that they have in fact identified a valid business expectancy.  To start, in response to Uber's claim that mere hope of a future commercial transaction is not enough, the

Plaintiffs boldly assert that "[u]nder Missouri law, hope is expectancy." (Resp. at 4 (emphasis removed)). But settled Missouri law shows that Plaintiffs are just flat wrong: "[T]he existence of a valid business expectancy will not be found where the facts showed a ***mere hope*** of establishing a business relationship which was tenuous." *Serv. Vending Co. v. Wal-Mart Stores, Inc.*, 93 S.W.3d 764, 769 (Mo. Ct. App. 2002) (emphasis added); *see also Battlefield Ctr., L.P. v. Nat'l City Corp.*, No. 4:08CV00625 JCH, 2008 WL 4790328, at *4 (E.D. Mo. Oct. 27, 2008) (same); *Sales Res., Inc.*, 2010 WL 5184943, at *10 ("more than 'mere hope' of continuing a business relationship is required to show the reasonableness of a business expectancy").

Indeed, Missouri courts have even rejected "hope" as the basis for a business expectancy where that hope arose from ***an actual history of working together***. *See Rhodes Eng. Co. v. Pub. Water Supply Dist. No. 1 of Holt Cty.*, 128 S.W.3d 550, 566 (Mo. Ct. App. 2004). In *Rhodes*, a plaintiff engineering firm claimed a business expectancy in a permanent contract to provide engineering services for building a water supply system, based on the "betting-on-the-come" theory that its preliminary work on the system pursuant to an earlier interim contract would result in the plaintiff being awarded the permanent contract. *Id*. at 553. The Court granted summary judgment to the defendants on the tortious interference claim, rejecting this assertion of business expectancy as a matter of law. "[A]fter completing the work under the Interim Agreement, Plaintiff could have no ***reasonable*** expectation it would also be awarded the permanent contract, at least not the type of expectation that could be ***tortiously*** interfered with." *Id*. at 566. "Plaintiff may have hoped its hard work paid off, but any interference with that hope simply would not be enough to impose liability against the Defendants here." *Id*. In other words, the standard for showing the "reasonable" business expectancy needed to satisfy the tortious interference element is a relatively high bar, one that courts routinely enforce as a matter

11

of law, and one that, despite Plaintiffs' contrary claims, is not satisfied by "mere hope." Filling in the language from *Rhodes* on the facts here drives the point home: "after completing the work [of providing for-hire transportation in one instance], Plaintiff [drivers] could have no reasonable expectation that [they] would also be awarded [the opportunity to provide transportation services to that customer in the future], at least not the type of expectation that could be tortiously interfered with." And again, Plaintiffs are even one step more removed from *Rhodes* because they do not (and cannot) allege any specific customers with whom they had an actual working history, precisely because no driver can have any expectancy with regard to any individual rider.

The decision in *Sloan* likewise reinforces the point that, contrary to Plaintiffs' assertions, hoping to serve the public at large is not, to use the terminology from *Rhodes*, a "***reasonable*** expectation . . . that could be ***tortiously*** interfered with," even if the plaintiff has had a history of unchallenged access to an entire market. In *Sloan*, an insurance salesperson used "turning 65 lists" to sell Medicare supplement insurance. 1 S.W.3d at 558. These lists generated up to 200 names each month of people about to turn 65, the top target customer group for that insurance product. *Id.* When the policy provider introduced a policy limiting the salesperson's use of such lists to about 10 people per month in a limited territory (rather than the entire 200-person full monthly list), the salesperson sued, claiming tortious interference with his business expectancy in people on the "turning 65 lists" that the new policy prevented him from contacting. *Id.* at 559-560. The Court affirmed the trial court's grant of JNOV, finding no valid business expectancy in people on the lists who did not already have a prior business relationship with the plaintiff: "Mr. Sloan has no course of prior dealings with these people, and no prior relationship [with] them." *Id*. at 565. The court then went on to observe:

> Were we to hold otherwise, Sloan would ensure exclusive entitlement to contact
> the prospects on the list simply by notifying all other insurance agents, with any

> company selling Medicare supplement insurance, of his expectancy in the
> prospects on the list. Anyone interfering would be required to demonstrate
> justification for interfering. We do not think that is the law. We believe the
> prospects on the turning 65 lists are legally "up for grabs."

*Id*. The same is true here, and more. Just like the insurance prospects at issue in *Sloan*, the potential transportation services users here are "legally 'up for grabs.'" That is particularly true as Plaintiffs here are attempting to stake a legal claim not just to a specific *list* of persons who might use for-hire transportation in the future (as in *Sloan*), but to *all* such persons in St. Louis. Under *Sloan*, as a matter of law, that is not a sufficient business expectancy to support a tortious interference claim. Indeed, in granting JNOV for this reason, the trial court noted, "I should not have allowed the case to be tried on this issue. I deeply regret not having removed this issue before." *Id*. at 564. This Court should grant Uber's motion to dismiss for the same reason.

None of Plaintiffs' cited authority contradicts this. *Bell v. May Dept. Stores Co.*, 6 S.W.3d 871 (Mo. 1999) (Resp. at 4), held, unremarkably, that a plaintiff has a valid expectancy in his own future chances of obtaining credit. This makes sense given the reasonable expectation that the plaintiff would seek credit at least once at some point in the future, and the alleged conduct (damage to his credit rating) would necessarily interfere with *every* such effort. *Id*. at 876. The same reasoning explains *Weicht v. Suburban Newspapers of Greater St. Louis, Inc.*, 32 S.W.3d 592 (Mo. Ct. App. 2000) (Resp. at 4), in which the plaintiffs owned individual, specifically identifiable newspaper routes. Those plaintiffs claimed that, when the company that published the local newspaper announced an intention to eliminate route ownership, that prevented the plaintiffs from selling their ownership interests in their routes (as had been the common practice in the past) to *anyone*. *Id*. at 595. The court concluded that in that circumstance, the plaintiffs adequately pled tortious interference "without pleading specific potential purchasers." *Id*. at 598. To be sure, if Plaintiffs here could plausibly allege that Uber

took steps to prevent them from ever again picking up a single fare in their taxis—say, for instance, if Plaintiffs could plausibly allege that Uber stole their taxis—these cases might be relevant. But, of course, Plaintiffs have not made, and cannot make, any such allegation here.

*Western Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 19 (Mo. 2012) (Resp. at 4), fares no better. The court there held that a regular course of prior dealings with a particular party can suggest a valid business expectancy—i.e., a "probable future business relationship," *id*. at 19— **with that same party**. There, the plaintiff claimed a valid business expectancy in a public-bid contract with a university that the plaintiff had been awarded **twice before**. *Western Blue Print*'s uncontroversial point was merely that the plaintiff did not need to prove that the parties had already re-upped for a third contract in order to establish a reasonable expectancy in that third contract. Here, Plaintiffs do not allege, nor could they plausibly do so, that Uber is attempting to drive a wedge between them and specifically identified repeat customers. The nature of the taxi business—which largely consists of customers hailing, or calling dispatchers for, the first available cab, regardless of the driver—prevents any such plausible allegation.

Likewise, in *Carter* (Resp. at 4-5), the business expectancy was not simply a mere hope of serving the public at large, but an expectation that referrals from other **specific doctors** at the hospital where the physician practiced would continue **as they had in the past**. *Carter*, 88 S.W.3d at 7. Again, here, Plaintiffs do not allege any interference with any specific past or repeat customer, nor do they allege any expectancy of business being funneled to them through any specific referral source. Instead, they simply stake a flawed legal claim to the entirety of the St. Louis for-hire transportation market.

Plaintiffs' recitation of their Complaint allegations (Resp. at 5) fares no better than their cited authority. Plaintiffs point to generalized allegations that they are losing overall business

14

since uberX became available, but these allegations do not show the specific business expectancy that Missouri law requires. Indeed, the generalized allegations that Plaintiffs are losing business only raise the question: *which* Plaintiffs lost which riders? That is, these Plaintiffs compete *with each other* for riders—or at least they should. *But see Wallen v. MTC*, Case. No. 15-CV-1432 HEA (E.D. Mo.) (alleging concerted action within the St. Louis taxicab industry designed to prevent Uber's entry into the market). Each Plaintiff bears a risk of losing a particular rider on a particular day to another taxi driver—to say nothing of drivers using uberX. Plaintiff Vilcek, for example, could lose a particular fare to Plaintiff Uchendi. In short, given the hundreds of drivers on the street, no one driver could possibly have a "valid expectancy"—i.e., a *reasonable* hope— as to any particular customer seeking transportation. Plaintiffs apparently attempt to solve this problem by banding together in a concerted effort (as the taxi industry has done time and again in St. Louis) to stop one subset of those drivers, those using uberX. But that solves nothing; if anything, it highlights the problems lurking down the road if this case were ever to reach the class certification stage. In short, there is (or at least there should be) no legally cognizable writ-large business expectancy owned by the taxi industry (or its drivers) as a collective whole— indeed, under basic antitrust principles, they are not supposed to be acting in a concerted fashion at all.

As no one taxi driver can seriously claim a personal business expectancy that encompasses all of the riders in the St. Louis metropolitan area, each plaintiff lacks a cognizable business expectancy. Accordingly, their tortious interference claim fails as a matter of law.

## CONCLUSION

For these reasons and those set forth in its original Memorandum in Support, Uber respectfully requests this Court to dismiss this action with prejudice.

Dated: February 8, 2016　　　　　　　Respectfully submitted,

By:    */s/ James F. Bennett*
James F. Bennett    #46826 MO
Sheena R. Hamilton    #62921 MO
DOWD BENNETT LLP
7733 Forsyth Blvd., Suite 1900
St. Louis, Missouri 63105
(314) 889-7300 (telephone)
(314) 863-2111 (facsimile)
jbennett@dowdbennett.com
shamilton@dowdbennett.com

Douglas R. Cole, *admitted pro hac vice*
Erik J. Clark, *admitted pro hac vice*
ORGAN COLE LLP
1330 Dublin Road
Columbus, OH 43215
(614) 481-0900 (telephone)
(614) 481-0904 (facsimile)
drcole@organcole.com
ejclark@organcole.com

*Attorneys for Defendant Uber Technologies, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system on all counsel of record.

                                       _/s/ James F. Bennett_